Finch, J.
The judgment sought against the defendant is one of corporate death. The State, which created, asks us to destroy, and the penalty invoked represents the extreme rigor of the law. Its infliction must rest upon grave cause, and be warranted by material misconduct. The life - of a corporation is indeed less than that of the humblest citizen, and yet it envelopes great accumulations of property, moves and carries in large volume the business and enterprise of the people, and may not be destroyed without clear and abundant reason. That would be true even if the Legislature *3 should debate the destruction of the corporate life by a repeal of the corporate charter, but it is beyond dispute where the State summons" the offender before its judicial tribunals and submits its complaint to their judgment and view. By that process it assumes the burden of establishing the charges which it has made, and must show us warrant in the facts for the relief which it seeks.
Two of the charges preferred in the complaint have dropped out of sight. They were of little importance, and have been prudently dismissed from the inquiry for that reason, and we are left to consider the one grave and serious accusation to which alone the proofs and argument have been directed. That accusation is adequate to the purpose for which it was framed but upon two conditions, which dictate the line of inquiry and limit the area of discussion. It appears to be settled that the State, as- prosecutor', must show on the part of the' corporation accused some sin against the law of its being, which has produced or tends to produce injury to the public. The transgression must not be merely formal or incidental, but material and serious, and such as to harm or menace the public welfare. For the State does not concern itself with the quarrels of private litigants. It furnishes for them sufficient courts and remedies, but intervenes as a party only where some public interest requires its action. Corporations may and often do exceed their authority where only private rights are affected. When these are adjusted all mischief ends and all harm is averted. But where the transgression has a wider scope, and threatens the welfare of the people, they may summon the offender to answer for the abuse of its franchise or the violation of its corporate duty. The Code of Civil Procedure authorizes an action for that purpose when the corporation has “ violated any provision of law whereby it has forfeited its charter or become liable to be dissolved by the abuse of its powers.” In Thompson v. People (23 Wend. 583) the ground of forfeiture was tersely described as some IC misdemeanor in the trust injurious to the public,” and as recently as the case *4 of Leslie v. Lorillard (110 N. Y. 531) we said, “in the granting of charters the Legislature is presumed to have had in view the public interest; and public policy is concerned in the restriction of corporations within chartered limits ; and a departure therefrom is only deemed excusable when it cannot result in prejudice to the public.”
Two questions, therefore, open before us : first, has the defendant corporation exceeded its powers? and second, does that excess or abuse threaten or harm the public welfare ?
The first question requires us to ascertain what the defendant corporation has done in violation of its duty, or omitted to do in performance of its duty. We find disclosed by the proof that it has become an integral part and constituent element of a combination which possesses over it an absolute control, which has absorbed most of its corporate functions, and dictates the extent and manner and terms of its entire business activity. Into that combination, which drew into its control sixteen other corporations engaged in the refining of sugar, the defendant has gone, in some manner and by some process, for, as an unquestionable truth, we find it there. All its stock has been transferred to the central association of eleven individuals denominated a “ board;” in exchange it has taken and distributed to its own stockholders certificates of the board carrying a proportionate interest in what it describes as its capital stock; the new directors of the defendant corporation have been chosen by the board, made eligible by its gift of single shares, and liable to removal under the terms of their appointment at any moment of independent action. It has lost the power to make a dividend, and is compelled to pay over its net earnings to the master whose servant it has become. Under the orders of that master it has ceased to refine sugar, and by so much has lessened the supply upon the market. It cannot stir unless the master approves, and yet is entitled to receive from the earnings of the other refineries, massed as profits in the treasury of the board, its proportionate share for division among its own stockholders holding the substi *5 tuted certificates. In return for this advantage it has become liable to be mortgaged, not for its own corporate benefit alone, but to supply with funds the controlling board when reaching out for other and coveted refineries. No one can look these facts fairly in the face without being compelled to say that the defendant is in the combination, and in to stay. Indeed, so much is with great frankness admitted on the part of appellant. Its counsel concedes that the stock was transferred “ to the board mentioned in the, agreement, and on the terms and for the purposes mentioned in the agreement; and that this action effectually lodged the control of the defendant company, so far as such control can be secured by the voting power, in that board.”
But that proof does not alone solve the problem, presented. We are yet to ascertain whether the corporation became the subordinate and servant of the board by its own voluntary action, or the will and power of others than itself; by force of a contract to which it was in reality a party, or as the simple consequence of a change of owners; by its fault or its misfortune; by a sale or by a trust. For if it has done nothing, if what has happened and all that has happened is ascertained to be that the stockholders of the defendant, one or many, sold absolutely to the eleven men who constituted the board their entire stock, and the latter, by force of their proprietorship and as owners, have merely chosen directors in their own • interest, and are only managing their property in their own way as any absolute owners may; if that is the truth, and the entire and exact truth, it is difficult to see wherein the corporation has sinned, or what it has done beyond merely omitting for a time to carry on its business. That is the theory upon which the appellants stand and which they submit to our examination.
On the other hand, it is contended that there never was a sale, but a trust constituted by mutual agreement; that they who agreed were the whole body of stockholders in each corporation, necessarily representing and binding the corporation itself; that they transferred their shares to the *6 board upon the trusts declared in the deed; that the certificates issued by the board were the formal declaration of the trust; that the corporate stockholders parted with the legal title of their stock to the chosen trustees with the power to vote upon it, but retained nevertheless its beneficial ownership through the operation of the certificates; and so the corporations entered into a partnership with each other vesting the partnership power in a board of control.
I have brought these two theories face to face where they may confront each other, because when a choice is made between them, we have gone a long distance toward the end of the controversy.
In making that choice we must necessarily analyse and construe the deed or contract which formed the terms of the combination, and which not only dictated its character but brought it into existence. That contract, on the theory of a sale, is an unexpected and unaccountable document. A sale presumes vendors on the one side and vendees on the other, each having life and existence and the power and ability to contract. Here there was no joint stock association existing or organized until the vendors themselves created it, and they were obliged to construct their vendee in the very act-of transfer. A contract of sale implies some negotiation between buyer and seller, each consulting his own interest and acting independently and of his free choice. Here there 'were no negotiations with the board, but the vendors having created their vendee, themselves alone dictated the terms on which they should sell and it should buy. The selling stockholder explicitly swears that the board had nothing whatever to do with fixing the price. In a contract of sale covering property valued at some fifty millions' of dollars and containing a patient statement of the terms of the trade, we should naturally expect that at least the buyer would give it his signature and bind himself to the purchase. This contract of sale is not signed by the vendees at all, and their assent is left to be supplied by inference from their action. In an ordinary sale the vendee *7 becomes owner, and has the rights of an owner, and may do what- he pleases with his own ; but this contract tells the owners what they shall do with the property bought and how they shall hold it, and inferentially at least, forbids its further sale or transfer. As a general rule the vendor fixes the value or price of the property which he sells, or sometimes submits the question to disinterested appraisers, but this contract of sale generously allows the value of the personal property, separate from the plant, to be appraised and fixed by five persons, all of whom are themselves among the purchasers.
These are general considerations which make one hesitate over the theory of a sale as distinguished from a trust; but the doubt increases as we come closer to the details of the agreement and scrutinize its exact terms.
It is observable that the selected transferee of the stock of the corporations was denominated simply a “board.” That implied agency—a committee of managers—official servants charged with executive duties and acting for and in the interest of others. The idea of a joint stock association, capable of buying and acting as purchaser, had not yet dawned. Explicitly the deed declares “ the shares of the-capital stock of the several corporations to be transferred to the board as herein provided shall be transferred to the names of the board as trustees, to be held by them and by their successors as members of the board strictly as joint tenants.” If beyond the inference of agency, suggested by the name and description of the board, more was needed to indicate the real aim and intention, it is supplied by the frank declaration that the transferees shall take as trustees and hold in joint tenancy, which is the characteristic manner of a trust.
Other clauses in the instrument point significantly to the same construction. The purchase of stock in a corporation makes the buyer a stockholder. Ho such purchaser would think for a moment of requiring from the corporation a stipulation that he should have the rights of a stockholder, *8 for those rights attach at once by force of his ownership. Yet we find in the document under examination, following the provision which requires the board to take as trustees, a clause entirely superfluous, if a sale was meant, but a reasonable stipulation if a trust was intended, that “ the board shall hold the stock transferred to it with all the rights and powers incident to stockholders in the several corporations.” The clause carries with it a distinct suggestion that no absolute sale was intended, but a transfer in trust which might leave the assignors who became the beneficiaries some equitable right over the voting power, and to make sure of the vesting of that right in the trustees, a specific and broad covenant was adopted adequate for all emergencies.
The owners of corporate stock, by force of their ownership, may put a mortgage upon the corporate property when the statute permits. Xobody doubts that, and no buyer would demand that permission of the seller. But the contract in question explicitly authorizes the board to raise money by mortgages-upon the property of the corporations. It strikes one as odd to see an absolute purchaser requiring his vendor in the deed of conveyance to covenant that the grantee may be at liberty to incumber by mortgage his own property. The astute pen which framed the deed of association had a very different aim, and realized that trustees, holding for trust purposes, should have power to mortgage given them, if that necessity was contemplated.
A vendor about to sell liis property, and to a very large amount, naturally looks carefully to his pay. A merchant or manufacturer who should sell his wares to a corporation having no other capital than the exact property bought, and take his pay in the stock of such corporation, would scarcely be deemed sane in business circles. The board organized by the refineries had a nominal capital of fifty millions, but not a single dollar of actual capital beyond the corporate shares transferred ; and so the sellers, if indeed they were such, got aliquot parts of their own property in payment of the transfer. If they sold it, they simply got it back under a new *9 name, and, as we shall see, heavily watered, and with its care and management entrusted to others, under an arrangement which might or might not add to its earning power.
If, in truth, the board was meant to be anything more than a trustee or manager of the combined* corporations ; if it was contemplated that it should become and be a joint stock association at all, it was put by the very articles of its creation, under the most singular and oppressive restrictions. What shall we say of a joint stock association without a dollar of actual capital, and yet forbidden to incur the least debt or obligation ? It was commanded that “ no action be taken by the board which shall create liability by it or by its members.” Without a dollar, it could not borrow a dollar ; without money, it could incur no debt; its cash resources were to come from a sale of its own certificates reserved over and above those allotted, or from mortgages made by the separate corporations, and yet this curious creation, viewed as a joint stock association, was able to induce the sale to it of twenty corporations. The stockholders, with astonishing generosity, sold and transferred to it all their stock, allowed it to pocket 15 per cent, of its agreed value, and took aliquot parts of the remainder of their own property for their pay. It seems to me that the theory of an absolute sale involves us in difficulties and complications on almost every page of the deed or combination agreement, and that it is an afterthought framed under pressure and mismatching the entire tenor and terms of the instrument which it was invented to sustain. Indeed, I notice, among the briefs submitted to our study, a reprint of an article from a distinguished pen, which traces the origin and history of economic combinations and monopolies, and ends with a determined defense of the one under review, but concedes it to be a trust, created by contract, and organized and existing as such.
The combination, therefore, framed by the deed was a trust; and, if created by the corporations, or in any respect the consequence or product of their action, some inevitable *10 results would be certain to follow. But here we encounter the stronghold of the appellant’s argument, which is, that if the corporations are in some manner in the combination, they are there solely as the result of a contract other than their own; are there without corporate action on their part; and so are sufferers and not sinners. The reasoning leading to that result is so severely technical as to have suggested a justification almost reminding one of an apology. We are called upon to sever the corporation, the abstract legal entity, from the living and acting corporators ; as it were to separate in our thought the soul from the body, and admitting the sins of the latter, to adjudge that the former remains pure. Let us first recall the facts in the order of their occurrence.
On April 22, 1887, there was a meeting of defendants’ stockholders at which all the trustees were present. At that meeting the following preamble and resolutions were adopted by a unanimous vote :
“Whereas, it is contemplated that the several sugar refineries in New York and other cities shall consolidate their several refineries in one large concern or company, and
“Whereas, we deem it for the interest of the North Biver Sugar Befining Company to participate in the above said consolidation, therefore be it
“ Resolved, That Peter Holler, Jr., George H. Holler and Gerd Hartins be, and they are hereby appointed a committee to make arrangements to perfect the said consolidation in behalf of the North Biver Sugar Befining Company, with full power to act and to sign all contracts and agreements in the name of the said North Biver Sugar Befining Company, of whatever name or nature, concerning the said consolidation.
“ Resolved, That wo authorize the president and secretary of the North Biver Sugar Befining Company to sign all contracts, agreements and papers which the above named committee may make in relation to the said consolidation.”
In September following the secretary of the corporation *11 added its signature to the deed. He tells us under oath : “I made that signature by virtue of authority from the stockholders and the board of officers of the North River Sugar Refining Company, the stockholders and trustees.” It follows that the committee to whom authority was given to make the agreement had made it. The stockholders, by a unanimous vote, decided to go into the proposed combination, and authorized their committee to agree on the terms. A trust of personal property may be created by parol. That the committee acted, that they contracted for their company upon the terms of the deed, is an inevitable inference from the action of the secretary, who swears that he signed by authority, and could have had none except upon the agreement of the committee. It was, therefore, actually made, and the official signature was but the evidence of the agreement entered into by them. Here was a deliberate corporate act, if stockholders and trustees united can ever perform one, attested by one of the two officers who were authorized to sign At that moment the defendant company had become a party to the contract by the consent of everybody connected with the corporation, and by force of the agreement to that effect which the signature of the secretary shows had been made by the authorized agency.
But it is said the corporation repented and withdrew from the agreement. I do not stop to discuss the question whether they could revoke without the consent of the board, and their associates in the trust deed, for, assuming that they could, I prefer to analyze their revocation and see the scope and range of their repentance. The corporation remained a contracting creator of the trust until November 4,1887. By the deed the trust took effect on October 1 of that year, so that the defendant in its full corporate character became a party to it according to the terms of the deed, and remained bound by it for at least one month. But then there did come either repentance or fear. In November the stockholders again assembled and passed the resolution which is relied upon as a revocation. , Its preamble recites a series of *12 denials that the committee had made any agreement, or that the president and secretary had signed any ; and then, after declaring “ it is deemed inexpedient at the present time to enter into any such consolidation,” they revoked the powers conferred and the resolutions conferring them. That is to say, after the powers had been executed and had put the corporation into the combination, and it had become a constituent element of the trust, those powers were revoked upon a false assertion that they remained executory, and so their revocation could be effective. I say a false assertion, for we are not at liberty to believe that George H. Holler, who was secretary of the corporation and oné of the very committee authorized to make the agreement of consolidation, signed the deed when he knew the committee had not agreed, and so in violation of his duty and without authority, and then positively swore that he signed by authority of the stockholders and trustees. His act and his oath heavily outweigh the resolutions of repentance.' Let us not fail to observe that no signature is withdrawn, no notice is served upon the board or the associates, no consent of theirs asked or demanded, but the parties of one part to a contract came together and pass a resolution that they have not contracted and do not mean to, and rely upon that as releasing them from their obligation. All that they effectually did was to raise a question of veracity, which' must be decided against them upon the act and the oath of their own officer.
That repentance proved to be only a preclude to the exact sin claimed to have been avoided. On November 25, 1887, which was just three weeks after the resolutions of revocation, the stockholders of the defendant company formally resolved to sell their capital stock for $325,000 to John E. Searles, Jr. It is not unworthy of notice that the resolution to sell is prefaced by a recital that their secretary had signed a deed of consolidation “ under the belief that he was authorized so to do,” a matter which had nothing to do with the new agreement which lay beneath the surface. The committee to deliver the stock consisted of the same three *13 persons who had originally been authorized to make the agreement of consolidation which had already being- signed by Searles, as treasurer of the Havemeyer Sugar Refining Company. The stock was delivered to him, the price paid to the stockholders, and so Searles became the one sole and only stockholder of the defendant company. He and the “ legal entity ” alone survived, and the latter apparently in a state of suspended animation. An effort was made to ascertain from what source the purchase money came, but was not altogether successful. Searles did not furnish it. A certain committee of three did, who were to transfer the stock to the board.
Searle adds: “ These three gentlemen whom I have named as trustees of certain funds paid for the stock; funds received by them for mortgages and other matters connected with the organization. Q. What organization ? A. The Sugar Refineries Company, the board.” Well, the board got the stock from Searles, sole owner and sole stockholder, and gave in exchange certificates for seven hundred thousand dollars, or a little more than double the purchase price, and which indicates the amount of water in the board’s capital stock. From that, however, was deducted the fifteen per cent, retained by the combination. What Searles did with the certificates we do not know, nor is it important to ascertain. We do know that new directors were chosen by the vote of the board, that Searles became president of the corporation, that its share of the regular dividend has been allotted to it for its certificate holders, and that it has wholly ceased to refine sugar. And thus its baptism in the pool of the board became complete and final.
And yet it is argued that the corporation, the legal entity, has done nothing; that Searles was guilty, but the corporate robe that enveloped him was innocent, and so he must be left to wear it undisturbed; that while all that was human and could act had sinned, yet the impalpable entity had not acted at all and must go free. I believe that the history of what occurred as I have already described it furnishes a sufficient *14 answer, assuming that stockholders and trustees acting together can do a corporate act at all. There was corporate action in making the combination agreement which bound the defendant. The revocation of an executed authority left the contract standing. The corporation thus helped to make the trust and became an element of it. If there was anything imperfect in its action, the new stockholder and his associates waived the imperfection by acting upon the agreement of the corporation, and so confirming it in all particulars.
But the assumption underlying the view I have expressed is itself contested, and a proposition asserted which denies the possibility of any corporate action except by the trustees or directors acting formally as such, a proposition which, if sound, dominates the whole field of controversy, and establishing that there has been no corporate action at all, effectually shuts out every question of illegality, or public injury. I cannot admit that proposition. I think there may be actual corporate conduct which is not formal corporate action ; and where that conduct is directed or produced by the whole body both of officers and stockholders, by every living instrumentality which can possess and wield the corporate franchise, that conduct is of a corporate character, and if illegal and injurious may deserve and receive the penalty of dissolution. There always is, and there always must be, corporate conduct without formal corporate action where the thing challenged is an omission to act at all. A corporation, organized in the public interest, with a view to the public welfare, and in the expectation of benefit to the community, which is the motive of the State’s grant, may accept the franchise, and hold it in sullen silence, doing nothing, resolving nothing, furnishing no formal corporate action upon which the State can put its finger, and say, this the corporation has done by the agency through which it is authorized to act. That is corporate conduct, which the State may question and punish without searching for a formal corporate act. The directors of a corporation, its authorized and active agency, may see the stockholders pcr *15 verting its normal purposes by handing it over, bound and helpless, to an irresponsible and foreign authority, and omit all action which they ought to take, offer no resistance, make no protest, but silently acquiesce as directors in the wrong which, as stockholders, they have themselves helped to commit. That again is corporate conduct though there be an utter absence of directors’ resolutions. It is asked what they could have done to prevent the organization of the trust; how they were negligent and unfaithful as corporate officers by their omission to act; what good a mere protest or objection would have accomplished ; what effective form their resistance could have assumed ? The answer is that they could have refused to recognize-the illegal trust transfer of the stock; they could have declined to register the new ownership upon their stock books; they could have said, and acted upon their words, that the original stockholders remained not only the beneficial, but the legal owners of the stock; and if the board (trustees) appealed to the law, the resisting directors could challenge the legality of the transfer as moulded by the combination agreement, and might have defeated the trust and shattered it at the outset of its career. So much they could have done as corporate officers ; so much it was their duty to have done as representatives of the corporation ; and when beyond that corporate neglect they recognized the validity of the stock transfers in trust, put the new and unlawful ownership upon their books, and accepted its votes in the choice of new directors who were to throttle the independence of the corporation and chain it to the will of the trust, I think we must shut our eyes in willful blindness if we fail to see both corporate neglect and corporate action.
It is true, as w'e are reminded, that the statute confers upon trustees and directors general authority to manage the stock, property and concerns of manufacturing corporations, and equally true that, as a general rule, and as between the companies and those with whom they deal, the corporate action must be manifested through and by the directors; bnt *16 other statutes indicate with equal plainness that there are corporate acts wdiich the trustees cannot perform, and which affect and bind the corporation only upon the condition that they proceed from the stockholders, or from them and the trustees acting together. In increasing or diminishing the capital stock the corporate act is wholly that of the corpora-tors, and in consolidating two or more companies into one there must be the joint action of both trustees and stockholders. The trust of the refineries, in substance and effect, approached very near to these two corporate acts, so far as the resultant consequences affected the corporators acting. The trust stipulations practically doubled their corporate stock through the agency of the certificates issued, and the combination in its result is largely the equivalent of a substantial consolidation. If these things had been done lawfully, they would have been accomplished by the united action of trustees and corporators, and beyond any question would have been corporate acts. Having been done unlawfully, but by the same united agency aiming at similar results, they must still constitute corporate conduct, unless the bare fact of their illegality takes away their corporate character. To say that, would disarm the State in every case of misuse or abuse of chartered powers.
The abstract idea of a corporation, the legal entity, the impalpable and intangible creation of human thought, is itself a fiction, and has been appropriately described as a figure of speech. It serves very well to designate in our minds the collective action and agency of many individuals as permitted by the law, and the substantial inquiry always is, what in a given case has been that collective action and agency. As between the corporation and those with whom it deals, the manner of its exercise usually is material, but as between it and the State the substantial inquiry is only what that collective action and agency has done, what it has in fact, accomplished, what is seen to be its effective work, what has been its conduct. It ought not to be otherwise. The State gave the franchise, the charter, not to the impal *17 pable, intangible and almost nebulous fiction of our thought, but to the corporators, the individuals, the acting and living men, i to be used by them, to redound to their benefit, to strengthen their hands and add energy to their capital. If it is taken away, it is taken from them as individuals and corporators; and their legal fiction disappears. The benefit is theirs, the punishment is theirs, and both must attend and depend upon their conduct; and when they all act collectively as an aggregate body, without the least exception, and so acting reach results and accomplish purposes clearly corporate in their character and affecting the vitality, the independence, the utility of the corporation itself, we cannot hesitate to conclude that there has been corporate conduct which the State- may review, and not be defeated by the. assumed innocence of a convenient fiction. As was said in People v. Kingston & Middletown Turnpike Co. (23 Wend. 193), “ though the proceeding by information be against the corporate body, it is the acts or omissions of the individual corporators that are the subject of the judgment of the court.”
It remains to determine whether the conduct of the defendant in participating in the creation of the trust, and becoming an element, was illegal and tended to the public injury, and we may consider the two questions together and without formal separation.
It is quite clear that the effect of the defendant’s action was to divest itself of the essential and vital elements of its franchise by placing them in trust; to accept from the State the gift of corporate life only to disregard the conditions, upon which it was given; to receive its powers and privileges merely to put them in pawn and to give away to art irresponsible board its entire independence and self-control. When it had passed into the hands of the trust only the shell of the corporation was left standing, as a seeming obedience to the law, but with its internal structure destroyed or removed. Its stockholders, retaining their beneficial interest, have separated from it their voting power, and so parted *18 with the control the charter gave them and the State required them to exercise. It has a board of directors nominally and formally in office, but qualified by shares which they do not own, and owing their official life to the board which can end their power at any moment of disobedience. It can make no dividends, whatever may be its net earnings, and must encumber its property at the command of its master and for purposes wholly foreign to its own corporate interests and duties. At the command of that master it has ceased to refine sugar, and without any doubt, for the purpose of so far lessening the market supply as to prevent what is termed “ over production.” In all these respects it has wasted and perverted the privileges conferred by the charter, abused its powers, and proved unfaithful to its duties. But graver still is the illegal action substituted for the conduct which the State had a right to expect and require. It has helped to create an anomalous trust, which is in substance and effect a partnership of twenty separate corporations. The State permits in many ways an aggregation of capital, but mindful of the possible dangers to the people, overbalancing the benefits, keeps upon it a restraining hand, and maintains over it a prudent supervision, where such aggregation depends upon its permission and grows out of its corporate grants. It is a violation of law for corporations to enter into a partnership (N. Y. Canal Co. v. Sharon, 7 Wend. 411; Clearwater v. Meredith, 1 Wall. 29; Whitteuton v. Upton, 10 Gray, 596).
The case last cited furnishes the reasons with precision and at length. It shows the utter inconsistency of a double allegiance by those who act for the corporation to two different principals, and demonstrates that the vital characteristics of the corporation are of necessity drowned in the paramount authority of the partnership. That the combination of the refineries partakes of the nature of a partnership is not denied. Indeed, in one of the papers added to the appellant’s brief, it is not only admitted, but asserted and defended. That paper shows quite clearly that by force of *19 an arrangement there was a community of interest in the fund created by the corporate earnings before division, and that each member of the trust shared in the profit and loss of all. It is said, however, that a consolidation of manufacturing corporations is permitted by the law, and that the trust or combination or partnership, however it may be described, amounts only to a practical consolidation, which public policy does not forbid because the statute permits it (Laws of 1867, ch. 960; Laws of 1884, ch. 367). The refineries did not avail themselves of that statute. They choose to disregard it, and to reach its practical results without subjection to the prudential restraints with which the State accompanied its permission. If there had been a consolidation under" the statute, one single corporation would have taken the place of the others dissolved. They would have disappeared utterly, and not, as under the trust, remained in apparent existence to threaten and menace other organizations and occupy the ground which otherwise would be left free. Under the statute the resultant combination would itself be a corporation, deriving its existence from the State, owing duties and ■obligations to the State, and subject to the control and supervision of the State; and not as here an unincorporated board, a colossal and gigantic partnership, having no corporate functions and owing no corporate allegiance. Under the statute the consolidated, taking the place of the separate ■corporations, could have as capital stock only an amount equal to the fair aggregate value of the rights and franchises of the companies absorbed, and not as here a capital stock double that value at the outset and capable of an elastic and irresponsible increase. The difference is very great, and serves further to indicate the inherent illegality of the trust combination.
And here, I think, we get a definite view of the injurious tendencies developed by its organization and operation, and of the public interests which are menaced by its action. As corporate grants are always assumed to have been made for the public benefit, any conduct which destroys their normal *20 functions, and maims and cripples their separate activity, and takes away their free and independent action, must so far disappoint the purpose of their creation as to affect unfavorably the public interest, and that to a much greater extent when beyond their own several aggregations of capital they compact them all into one combination, which stands outside of the ward of the State, which dominates the range of'an entire industry, and puts upon the market a capital stock, proudly defiant of actual values, and capable of unlimited expansion. It is not a sufficient answer to say that similar results may be lawfully accomplished ; that an individual having the necessary wealth might have bought all these refineries, manned them with his own chosen agents, and managed them as a group at his sovereign will; for it is one thing for the State to respect the rights of ownership and protect them out of regard to the business freedom of the citizen, and quite another thing to add to that possibility a further extension of those consequences by creating artificial persons to aid in producing such aggregations. The individuals are few who hold in possession such enormous wealth, and fewer still who peril it all in a manufacturing enterprise; but if corporations can combine, and mass their forces in a solid trust or partnership, with little added risk to the capital already embarked, without limit to the magnitude of the aggregation, a tempting and easy road is open to enormous combinations, vastly exceeding in number and in strength and in their power over industry any possibilities of individual ownership ; and the State by the creation of the artificial persons constituting the elements of the combination, and failing to limit and restrain their powers, becomes itself the responsible creator, the voluntary cause of an aggregation of capital which it simply endures in the individual as the product of his free agency. What it may bear is on thing; what it should cause and create is quite another.
And so we have reached our conclusion, and it appears to us to have been established that the defendant corporation *21 has violated its charter and failed in the performance of its corporate duties, and that in respects so material and important as to justify a judgment of dissolution. Having reached that result, it becomes needless to advance into the wider discussion over monopolies and competition and restraint of trade and the problems of political economy. Our duty is to leave them until some proper emergency compels their consideration. Without either approval or disapproval of the views expressed upon that branch of the case by the courts below, we are enabled to decide that in this State there can be no partnerships of separate and independent corporations, whether directly or indirectly through the medium of a trust; no substantial consolidations which avoid and disregard the statutory permissions and restraints; but that manufacturing corporations must be and remain several as they were created, or one under the statute.
The judgment appealed from should be affirmed, with costs.
All the judges concurred.
Note on the Decision in the Sugar Trust Case, and THE QUESTION FOR WHAT PURPOSES A CORPORATION IS TO BE DEEMED A PERSON DISTINCT FROM THE MEMBERS.
The decision here reported takes the discussion out of the category of criminal conspiracy and puts the decision on the clear and strong civil ground of a renunciation of the corporate powers by the act of the corporation.
The chief question of interest for the professional reader is in what way the principles established by it, control his course in advising on tho organization and administration of corporations.
The distinctness with which in the opening and also in the close of the opinion the court guard against inferring more than is decided, leaves the questions of monopoly and of combination to effect production of prices, where they were before.
The reader who will advert to tho exposition of the nature and law of “Trusts,” in 19 Abb. N. C. 450, will find that the case in the text adds to the principles which I stated on p. 454, as being already established by the courts, this further one : that the act of a corporation as such, in committing its stock *22 holders’ voting power to a trust, and in divesting itself of its corporate power, by subjecting itself to the direction and control of the trust, is a ground of forfeiture of charter.
The decision does not, however, directly answer the inquiries as to what stockholders may individually do, which I stated as the chief questions of practical interest, but it brings the progress of the discussion squarely up to those questions, clears the ground for their consideration, and throws some light on the policy of the law under which they are yet to be determined.
Those questions, as I then stated them, are as follows :
1. Do stockholders in the same corporation sustain a relation to each other which forbids a majority from combining with stockholders of other (companics, to secure concert of action, if it be secured without direct contract between the corporations P
2. Do such rules of law as forbid corporations to form direct combination by contract with each other, render unlawful combina'ions of stockholders in different corporations to effect the same result, by electing such boards of direction so as to secure concert of action without contract ?
3. Is the assumption, by the unincorporated trustees of a stock, of the power to issue in exchange, certificates, negotiable or otherwise, representing the ownership of the stock, minus the power to vote, an usurpation of a corporate franchise ?
4. Can the evils which are assigned as the ground for invoking the policy of the law against such trusts for the control of corporations, be remedied or restrained, without foregoing the just advantages of this new and powerful form of organization as a means of economy and efficiency and soundness in management ?
Although the decision in the text does not appear to answer these questions, the reasoning which leads the court to answer in the negative the question whether the corporation can as such transfer its powers to a trust, is instructive, as bearing on those questions.
Those reasons may be concisely outlined thus
The court first ask what this defendant corporation has done or omitted. Answer : It has renounced its powers by their transfer (including the power to make dividends, to go on with business, and to mortgage its property) to a third party; this has been done by a contract to which the corporation was a party (as distinguished from concurrence of stockholders in choosing directors who would hold those powers under a contemplated policy); this contract having been made by the stockholders and trustees acting as such at corporate meeting by corporate resolution and attested by corporate instrumentalities, must be deemed a corporate act. Moreover the submission of the corporate authorities to the consequences of a contract thus *23 renouncing the corporate powers, is in itself a ground of forfeiture.
In all this, acts of the stockholders are an element, but seem to be so treated because they were done under corporate forms, and co-operated with corporate acts or omissions in an actual divesting of corporate power.
The court next ask whether this conduct of the corporation is illegal as tending to public injury. Here again the renunciation of corporate power, by submission to the paramount authority of the partnership to take to itself the exercise o£ the corporate functions, and help given by the corporation to the creation of that partnership, is the cogent reason for the conclusion
Perhaps opinions will 'differ as to whether these reasons lead also to the conclusion that a trust is illegal which is constituted by stockholders acting as individuals, and seeking not to divest their corporation of powers, but to secure a board of directors who shall exercise those powers in the regular corporate manner, and freely, but in harmony of policy with other corporations. However this may be, it seems clear that the court have not in anywise directly impugned the validity of purely stock trusts, constituted by shareholders alone with, intent to exercise regularly, and not to renounce, the corporate powers and franchises.
Leaving the reader to note for himself the passages in the opinion which he may regard as bearing on this question, I will call attention to the underlying question, whether there is-for this purpose a substantial and vital distinction between the aggregate of corporators and the corporation; whether the members are the corporation. As yet the-law has no-one answer to this question in all its forms, and is not likely to have. Formany purposes they are essentially different. Some text writers have insisted strongly on the distinction. Others have deprecated it as illusory. The question is frequently mooted under various forms, and is an element of argument in many branches of corporate litigation at the present day.
Most of my readers will probably agree that neither of the opposing statements of iho text-writers quoted below is unqualifiedly sound. A corporation consists of the aggregate of its members when acting in a special form only. It differs also from the aggregate of its members in having more power and less liability. It is -impossible for any student, whether by discussing theories or by observing methods of business, to learn what a corporation is without forming a legal conception of it quite different from that which he can explain by merely modifying a description of the powers and liabilities of the aggregate of individual members. Hence the common law *24 view that it is a quasi person, best understood by contrasting rather than identifying it with its members.
The following selection of recent cases will give the reader a useful suggestion of the diversity of aspects in which the question comes up, and the reasons for not anticipating universal application of either view ; and by following the clue thus afforded to the great number of cases mooting this question, the reader will perhaps find further aid in solving the question whether a stockholders’ trust, which leaves the corporation in the full possession of all its corporate powers, invites judgment of forfeiture upon the corporation.
In connection with what is said in 19 Abb. N. C. 448, as to the control of one corporation over another by acquiring ownership of its stock, it may be useful to mention the recent methods of the organization of a new corporation for the sole purpose of acquiring and holding the stock of another corporation. The chief object of this is, doubtless, to capitalize the new company at a sum largely in excess of the pre-existing one ; and thus, without direct increase of stock, which might be criticised as “ watering,” to distribute the beneficial interest in a high-priced and high-dividend stock among a much larger number of holders, at lower prices and more ordinary dividends.

Notes of Authorities.

1. Text writers.] All the boohs quote from Chief Justice Marshall’s definition, given in the Dartmouth College case—“ án artificial being, invisible, intangible, and existing only in contemplation of law."
Angell and Ames, Corp. § 6, say, “ "When a corporation is said to be a person, it is understood to be so only in certain respects and for certain purposes, for it is strictly a political institution. The construction is, that when ‘ persons ’ are mentioned in a statute, corporations are included, if they fall within the general reason and design of th'e statute. . . A corporation may be considered in a twofold respect,—in the abstract and in the concrete. In the abstract it is not a person, nor an animated body, but is only a kind of feigned or intellectual body, or the representation of a body animated. In the concrete, it is taken for the particular members of such corporation. The latter may die, but the body corporate does not."
§ 7. “ But a corporation being a political institution merely, although, as above explained, it is regarded as a person, yet it has no other capacities than such as are necessary to effect the purposes of its creation. It cannot be deemed a moral agent, subject to moral obligation ; nor can it, like a natural person, be subject to personal suffering. *25 This principle explains many of the incapacities ascribed to corporation, and without, as Mr. Kyd says, having recourse to the quaint observation common in the old books, that it exists merely in idea, and has neither soul nor body.
Morawetz ( Priv. Corp. vol. 1, § 1,) says : “ While a corporation may, from one point of view, be considered as an entity without regard to the corporators who compose it, the fact remains self-evident that a corporation is not in reality a person or thing distinct from its constituent parts. The word ‘ corporation ’ is but a collective name for the corporators or members who compose an incorporate association; and where it is said that a corporation is itself a person, or being, or creature, this must be understood in a figurative sense only.” . . . “A legally constituted corporation is ordinarily treated at law, as well as in the transaction of ordinary business, as a distinct entity or person, without regard to its membership. In most cases this is a just as well as convenient means of working out .the rights of the real persons interested; however, it is essential to a clear understanding of many important branches]of the law of corporations to bear in mind distinctly, that the existence of a corporation independently of its shareholders is a fiction ; and that the rights and duties of an incorporated association are in reality the rights and duties of the persons who compose it, and not of an imaginary being.”
In vol. 1, § 227, the author says : “ The statement that a corporation is an artificial person, or entity, apart from its members, is merely a description in figurative language, of a corporation viewed as a collective body; a corporation is really an association of persons, and no judicial dictum or legislative enactment can alter this fact.”
§ 232. “ ... In all cases it is indispensable that the fiction of a corporate entity, apart from the individual shareholders, be preserved unimpaired, in measuring and enforcing those rights and obligations which are of a corporate character.
Taylor (Priv. Corp. § 51), says: “Such, then, are the two meanings of the term corporation; the one, the sum of legal relations subsisting in respect of the corporate enterprise; the other, the organic body of shareholders whose acts cause the operation of the rules of law in the constitution. These two conceptions include all that is really connected by the term, in whatever sense used. And if so, what has become of the venerable ‘ legal person ?’ Is he still somewhere, or has he always been imagined ? or is he nowhere, as he has always actually been ? Shall we regard him as being not only the sum of the legal relations in respect of the corporate enterprise, but also, as being at the same time the body corporate, consisting of shareholders ? Shall we say he is the combination, the mystic unification of our two conceptions ? Better *26 not; better forget him. For he is a conception, which, if it amounts to anything, is but a stumbling-block in the ■ advance of corporation laws towards the discrimination of the real rights of actual men and women. And then, after all, what has he ever been but an abstraction materialized in a name ?”
Waterman (Corp. vol. 1, § 2), says: “A corporation aggregate is a body created by law, composed of several persons under a special denomination, with the capacity of a continuous succession, and of acting in many respects as an individual, always maintaining its identity, and possessing, however long its duration, the same rights,” etc., etc.
§ 3. “ . . . The corporation has an existence^ separate and distinct from the persons composing it, who cannot individually exercise corporate powers, enforce corporate rights, or, as a rule, be made responsible for the corporate acts. . . . The property of a corporation is legally vested in itself, and not in its members; as individuals, they cannot; even by joining together unanimously, convey a title to it. Nor can they make a contract that will bind it, or enforce by action a contract that has been made with it. The artificial person called the corporation must manage its affairs in its own name as exclusively as a natural person manages his property and business.”
2. Necessity of members to constitute a corporation.'] Nashville v. Ward, 16 Lea (Tenn.) 27. An act stating “ that said institution is-hereby incorporated under the name and style of ‘ Ward’s Seminary for Young Ladies,’ ” but not naming or providing for any persons to perform the duties or exercise the rights conferred—Held, not to confer a valid charter upon the institution, which enabled it to perform the duties and exercise the rights which the act attempted to confer, without the agency of natural persons.
3. Effect of partners incorporating.] Locke Lane & Bodley Co., 35 Fed. Rep. 289. r Where the surviving members of a partnership organized as a corporation, and became its sole shareholders—Held, that the corporation did not thereby acquire any rights under a contract between the partnership and an inventor, whereby the partnership waste have the use and benefit of the invention.
[Compare McDonald v. Trogan Button Fastener Co., 31 State Rep. 374; affi’g 29 Id. 867.]
4. Corporation and its members, as owners.] Spurlock v. Missouri P. R. Co. (Mo. 1886) 7 West. Rep. 307. One who had paid part of a railroad tax, under an act making such tax certificates convertible into-stock certificates in the railroad company, sought to establish a lien on property in the hands of the railroad’s Vendee, under a foreclosure, on the principle that a lien “ results to one joint owner of any real estate *27 or other joint property, for repairs and improvements made upon such property for the joint benefit, and for disbursements touching the same.”—Held, that plaintiff could not claim under this rule. “The stockholder has a right to participate in the profits, but he cannot be said to be the joint owner of the property of the corporation.”
5. As grantors. J Baldwin v. Canfield, 26 Minn. 43. In a suit by stockholders to remove a cloud on the title to the corporate property, held, that a personal deed by one who owned all the stock conveying the property, could have no effect, and was not a cloud on the title any more than as if such property had been attempted to be deeded by an entire stranger.
6. As affected by personal incapacities.] Princeton Mining Co. v. First Nat. Bank, 7 Mont. 530. Held, in an action by a corporation to quiet title to its lands, that its title was not affected by the fact that one of its stockholders was an alien.
7. As contracting parties.] A general agent in Michigan and a financial officer in New York were the only stockholders having beneficial interests in the corporation, and the agent made notes in the corporate name. A holder suing on the notes, claimed that for several years the corporation had held no meetings; that the business in Michigan had been managed exclusively by the agent there, and that he and the New York officer had conducted business as if they were formerly a partnership; and that they therefore ought to be held as having fully authorized each other to exercise a partner’s powers, and that hence, the agent’s notes should be held binding on the corporation, although made without apparent corporate authority,-—Held, that inasmuch as it did not appear that plaintiffs’ acts wrnre influenced by the neglect to observe corporate formalities, and as he did not pretend to have dealt with them as partners, the notes purporting to be notes of the corporation—that plaintiff must, in order to recover, make out a corporate, not a partnership liability. New York Iron Mine v. First Nat. Bank, 39 Mich. 644.
8. As purchasers from each other without notice.] International W. & T. Co. v. McMorran (Mich. 1889) 41 N. W. Rep. 510. A corporation had purchased its personal property from one who was its president. In an action by one claiming under an unrecorded mortgage from such person, held, that the court erred in charging that such person’s knowledge of the unrecorded mortgage would be imputable to the corporation, he being its president, and would prevent the corporation from asserting that it was a bona fide purchaser from him. The question should have been submitted to the jury.
“ There is no legal identity between individuals and a corporation *28 ■which will prevent it from becoming a purchaser in good faith from one of its members.”
9. As hound, as successors, under each others contracts.] Moore & H. H. Co. v. Towers H. Co. (Ala. 1889) 6 So. Rep. 41. Where one of two competing mercantile firms sold certain of its stock to the other, and agreed, for a consideration, not to thereafter handle a certain line of goods within a certain territory, and its members and others subsequently formed a corporation to carry on the business.—Held, that in the absence of a showing that it was a mere paper corporation, formed for the purpose of evading obligations, the corporation would not be enjoined from carrying on the kind of business which the partnership had contracted not to do.
“ The general doctrine is well established, and obtains both at law and in equity, that a corporation is a distinct entity, to be considered separate and apart from the individuals who compose it, and is not to be affected by the personal rights and obligations and transactions of its stockholders, and this whether said rights accrued or obligations were incurred before or subsequent to incorporation.”
10. Schutte v. Florida C. R. Co., 3 Woods, 692. Where parties purchased a railroad, and took a conveyance therefor, leaving part of the purchase money unpaid, and then procured a legislative act incorporating them, as purchasers and owners. Held, that the railroad was subject to the vendor’s lien for the unpaid purchase money, in the hands of the company so formed ; and held further, that the lien was not discharged by the consolidation of such corporation with another.
11. As to fraud.] Des Moines Gas Co. v. West, 50 Iowa, 16, 25. The president of a corporation, who himself owned most of its stock, issued bonds in direct violation of its charter, and with the acquiescence of the other shareholders.—Held, in a suit by the corporation to have the bonds cancelled, and also the deed of trust securing them—that the corporation was bound by such acts of the president.
“ The legal rules which regard a corporation as an artificial person, to be bound only by acts done in accord with its charter, which permit it to hold property as a natural person, and limit the interest of the stockholder therein' to his shares, must all go down when they are attempted to be used as instruments of fraud by the dishonest, and stand in the way of equity.”
12. As to voluntary dissolution and division of assets, j See Skinner v. Smith, etc., 31 State. Rep. 468.
13. As “persons" under constitutional protection.] Santa Clara County v. Southern P. R. Co., 118 U. S. 394. In a suit against certain corporations for taxes alleged to be due from them, Ch. J. Waite *29 announced that “ The court does not wish to hear arguments on the question whether the provision in the fourteenth amendment to the Constitution, which forbids a State to deny to any person within its jurisdiction the equal protection of the laws, applies to these corporations. We are all of opinion that it does.”
14. As parties plaintiff.] Boyd v. Sims, 87 Tenn. 771. Stockholders of A. Co. brought suit for an injunction and account of damages against certain persons who were officers and directors of A. Co. and also of C. Co., which was also made a defendant, alleging an interference by 0. Co. with A. C#.’s business, its unauthorized use of A. Co.’s qffice, and absorption of its business, etc., and alleged that plaintiff’s had protested to “ said defendants ” against such course, but did not aver an effort to have A. Co. sue, nor a demand to its officers to do so, and a failure or refusal.
Held, the bill should have been dismissed on demurrer. Stockholders can only sue a third party for his wrongful conduct to the corporation, when the corporation itself through its management has failed or refused to comply with a demand to sue.
Hawes v. Oakland, 104 U. S. 450. A stockholder in a water company filed a bill against the city to which it was furnishing water and the company and its directors, alleging that it was unwarrantably furnishing the city with water free of charge, to the stockholders loss and damage, and also alleging that he had requested the president and directors to desist, but they had declined.—Held, that a demurrer to the bill, for want of equity, was properly sustained, as it did not aver anything but a mere request and refusal, no reasons, no meeting of the directors, nor attempt to ascertain the opinions of the other shareholders.
“To enable a stockholder in a corporation to sustain in a court of equity in „is own name, a suit founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff, there must exist, as the foundation of the suit, some action or threatened action of the managing board of directors or trustees of the corporation, which is beyond the authority conferred on them by their charter or other source of organization'; or such a fraudulent transaction completed or contemplated by the acting managers, in connection with some other party, or among themselves, or with other shareholders, as will result in serious injury to the corporation, or to the interests of the other shareholders; or, where the majority of shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation which is in violation of the rights of the other shareholders, and which can only be restrained by the aid of a court of equity.”
15. As citizens for purposes of jurisdiction.] Kansas P. R. Co. *30 Atchison, T. & P. R. Co., 112 U. S. 414. Mr. Justice Field: “In all cases where a Federal court can take jurisdiction of controversies between citizens, whether of different States or of the same State, it will take jurisdiction of like controversies between corporations and treat them as citizens of the State under whose laws they were created or continue to exist.”
16. Pacific Railroad v. Missouri P. R. Co., 23 Fed. Rep. 565. Plaintiff corporation was organized under the laws of Missouri; but its only place of business was, and long had been, in New York.—Held, on motion to remand, that plaintiff must0 be held to be a citizen of Missouri, where it was created. McCkaby, J., says: “ Strictly speaking, corporations cannot be citizens; and therefore, in order to hold them amenable to the Federal jurisdiction on the ground of citizenship, it has been found necessary to assume, often contrary to the fact, that all the stockholders are citizens of the State by which the corporation was created. It is only by virtue of this assumption that a corporation can be said to be a citizen of any State. The presumption that all the stockholders are citizens of the State under whose laws they incorporate is a conclusive presumption, and the fact will not be inquired into. The fact may be that not one of the stockholders is a citizen of such State; but if so, it cannot be made to appear. The place of transacting business cuts no figure. The corporation, for jurisdictional purposes, is a citizen of the State by which it was created, even if all its büsiness is transacted elsewhere, and all of its offices and places of business are outside of the State."
17. Fales v. Chicago, M. & St. Paul R. Co., 32 Fed. Rep. 673, also holds that, because of the conclusive presumption that the stockholders are citizens of the State under whose laws the corporation is created, “ and that the corporation itself, as a legal entity, cannot become a citizen of any State,” therefore, the corporation, “by engaging in business in other States, cannot acquire citizenship or residence therein."
18. The same decision is also made in Yuba County v. Pioneer Gold Min. Co., 32 Fed. Rep. 183; Loomis v. New York & C. G. C. Co., 33 Fed. Rep. 353.
19. Pacific Railroad v. Missouri P. R. Co., 23 Fed. Rep. 565. Plaintiff was a citizen of Missouri. Defendant was a consolidated corporation, formed by the union of six corporations, three of which were organized under the laws of Kansas, and three under the laws of Missouri.—Held, that the corporation must be treated as a citizen of both States for purposes of jurisdiction; and that the suit against it, brought by plaintiff in a State court in Kansas, and removed at defendant’s instance, must be remanded to the State court.
*31 20. Compare contra Union Trust Co. v. Rochester & P. R. Co., 29 Fed. Rep. 609.
21. Page v. Fall River, W. & P. R. Co., 81 Fed. Rep. 257. This case follows the rule stated in the last (Pa.) case.
22. As liable criminally.] State v. Murfreesboro’, 11 Humph. (Tenn.) 217. It was here held error to quash a presentment against the mayor and aldermen of a town corporation, for failure to keep a street in repair, on the ground that it did not state the names of the individuals composing the corporation. The members are not individually liable, and they need not be named.
23. State v. Great Works M. & M. Co., 20 Me. 41. On an indictment against a corporation for erecting a nuisance, in the shape of a dam-which its agent had done,-—Held, that when a misdemeanor is committed under color of corporate authority, the individuals, not the corporation, should be indicted.
This case is overruled in State v. Portland, 74 Me. 268, where it is held that a corporation is indictable for a nuisance.
24. Control of one by another.] With the case of the Car Co. v The R. R. Co., 115 U. S. 587, compare as to control of one corporation by another, Farnsworth v. Western Union Tel.Co., 6 N. Y. Supp. 735.